### Whitehill v. Matthews

C.P. of Delaware County, no. 94-13794.

*Gustine J. Pettagatti,* for plaintiff.

*Daniel J. Sherry,* for defendant.

SURRICK, *J.,* June 25, 1998—In March of 1993, plaintiff's decedent, Joann G. Palumbo, was 53 years old and she had been a patient of defendant, Ronald B. Anderson M.D., for 10 years. Dr. Anderson is a family physician. He was treating plaintiff's decedent for a multitude of physical problems and depression. Plaintiff's decedent had been taking prednisone, a steroid, for treatment of arthritis for approximately 17 years, the last 10 years of which Dr. Anderson had prescribed the drug. One of the possible side effects of long-term steroid use is the development of ulcers. Dr. Anderson had also prescribed the drug Toradol, a non-steroid, anti-inflammatory pain medication, for use by plaintiff. Toradol should not be used by patients who have a propensity for ulcers and gastritis.[1]

On March 1, 1993, plaintiff's decedent had an office visit with Dr. Anderson. She was complaining of back pain and had slight abdominal distention. Dr. Anderson noted that at that time, Toradol was helping the pain. On March 5, 1993, plaintiff's decedent again saw Dr. Anderson at his office. She continued to complain of pain and had some abdominal distention. On the night of March 5, plaintiff's decedent called Dr. Anderson complaining of severe pain. She advised him that she had eaten at McDonald's earlier that evening. Dr. Anderson prescribed Maalox and Darvocet and told plaintiff's decedent to call him if she did not feel better. On the morning of March 6, plaintiff's decedent continued to complain of pain. She was told by Dr. Anderson to go to the emergency room of defendant, Riddle Memorial Hospital. When plaintiff's decedent arrived at

---

1. The use of Toradol by plaintiff's decedent was a significant trial issue.

the emergency room about 2:30 p.m. on the afternoon of March 6, she came under the care of the emergency room physician, defendant, Herbert Matthews M.D. Dr. Matthews ordered an x-ray and other tests. Dr. Matthews misread the x-ray. The x-ray showed that plaintiff's decedent had a perforated ulcer. Dr. Matthews read the x-ray as normal and did not seek a consultation by a gastroenterologist.

Because of her complaints, plaintiff's decedent was admitted to the hospital. At about 12 midnight that night, the nurses at Riddle noted a significant drop in the blood pressure of plaintiff's decedent. Although there was a note in the chart to contact Dr. Anderson if there was a change in her condition, the nursing staff failed to notify Dr. Anderson or any other physician of the drop in the blood pressure. At 5:55 a.m. on the morning of March 7, 1993, plaintiff's decedent was found unresponsive and she was pronounced dead. The cause of death was "perforated acute peptic gastric ulcer." Later in the day of March 7, the radiologist at Riddle, Martin Hauser M.D., read the x-ray which had been misread by Dr. Matthews. Dr. Hauser found "free intraperitoneal air, suggesting that there had been perforation of a hollow viscus," *i.e.,* a perforated ulcer.

On May 14, 1993, plaintiff filed a wrongful death and survival action in this court under no. 93-6725. That action is entitled *Susan Whitehill, Executrix of the Estate of Joann G. Palumbo, Deceased v. Ronald B. Anderson M.D. and Riddle Memorial Hospital.* Plaintiff's complaint alleged, in pertinent part, as follows:

"(3) Defendant, Riddle Hospital, is a health care provider, with its principal place of business located at 1608 West Baltimore Pike, Media, Pennsylvania 19063-5177 and who at all times hereinafter mentioned rendered medical care to plaintiff's decedent through

its agents, servants, workmen, nurses, doctors and/or employees.

"(4) At all times material hereto, plaintiff's decedent, Joann G. Palumbo, deceased, was relying on . . . the good reputation of the defendant, Riddle Memorial Hospital, and its agents, servants, workmen, nurses, doctors and/or employees. . . .

"(9) On or about Saturday, March 6, 1993, plaintiff and her husband brought plaintiff's decedent to the emergency room of defendant, Riddle Memorial Hospital, where she was given treatment, where she was inter alia x-rayed . . . . Between the time of admission and date of decedent's demise at approximately 5:55 a.m. on Sunday, March 7, 1993, plaintiff's decedent's blood pressure which had been normal on admission, consistently dropped. . . .

"(12) The aforementioned death of plaintiff's decedent, Joann G. Palumbo, was caused by the negligence and carelessness of the defendant, Riddle Memorial Hospital, by their agents, servants, workmen, nurses, doctors and/or employees in that they failed to conform to an acceptable medical standards (sic) of care and ultimately increased the risk of harm suffered by plaintiff's decedent by:

"(a) Failing to have on hand at the defendant, Riddle Memorial Hospital, on plaintiff's decedent's date of admission, Saturday, March 6, 1993, a qualified radiologist who would have timely interpreted the abdominal x-ray as revealing a perforated ulcer in order to timely treat same.

"(b) Having residents and house physicians who failed to interpret the abdominal x-ray as showing a perforated ulcer and timely diagnosing and treating same.

"(c) Failing to call in for consultation, a gastroenterologist in order to determine the ideology (sic) of plaintiff's decedent (sic) acute abdomen.

"(d) Failing to timely diagnose and treat a perforated ulcer in spite of obvious clinical signs of a perforated ulcer such as pain, stomach distention and a decrease in blood pressure.

"(e) Failing to employ diagnostic modalities such as appropriate hemoglobin tests in order to ascertain that plaintiff's decedent was losing blood.

"(f) Failing to timely diagnose and treat the perforated ulcer. . . ."

On June 16, 1993, William F. Sutton, Esquire, of the law firm of Post and Schell entered his appearance on behalf of defendant, Riddle Memorial Hospital. Sutton on behalf of Riddle negotiated a settlement with the plaintiff in the amount of $150,000. On July 7, 1994, a joint tort-feasor release was executed by plaintiff. That release provides, in pertinent part, as follows:

"Joint Tort-Feasor Release

"In consideration of the payment of *$150,000*, I, the releasor, *Susan Whitehill,* executrix of the estate of *Joanne (sic) G. Palumbo,* deceased, do hereby and for my assigns, release *Riddle Memorial Hospital,* and its respective agents, ostensible agents, servants, heirs, executors, administrators, successors, assigns, hereinafter referred to as releasee, from any and all actions, causes of action, claims demands, damages, cost of any kind or sort arising out of or in any way growing out of any and all accidents, incidents, events, occurrences or series of same of medical malpractice, the results of which a claim and/or lawsuit has been made against releasee and *Ronald B. Anderson M.D.* as set forth in: *Susan Whitehill, Executrix of the Estate of Joanne*

*(sic) G. Palumbo, Deceased v. Riddle Memorial Hospital and Ronald B. Anderson M.D., Court of Common Pleas, Delaware County, no. 93-6725.* It is the intent of the parties that this release shall apply to any and all claims brought, or which could have been brought, by releasor against releasee, 'its agents, ostensible agents, heirs, servants, successors, assigns, executors or administrators,' pertaining to medical care provided to the decedent at Riddle Memorial Hospital. Releasor specifically agrees, in consideration for this settlement agreement, to refrain from commencing any and all litigation against releasee, its agents, ostensible agents, heirs, servants, successors, assigns, executors or administrators in connection with any claims brought, or which could have been brought, in lawsuit no. 93-6725. As part of this release, releasor surrenders any and all rights to pursue claims in connection with matters raised or that could have been raised, in lawsuit no. 93-6725 against any person or legal entity *except* Ronald B. Anderson M.D. Releasor retains, however, the right to pursue her claims in the aforementioned lawsuit, no. 93-6725, against Ronald B. Anderson M.D., *only.* . . .

"Releasor hereby declares and recognizes that he/she is represented by counsel, has carefully read this agreement before signing it, that the terms of this agreement have been fully explained by counsel and that the terms are fully understood and voluntarily accepted. It is further understood and agreed that this release is executed and delivered in accordance with, and is to be interpreted and construed by and under the statutes of the Commonwealth of Pennsylvania. . . ."

On November 18, 1994, plaintiff filed a second wrongful death and survival action in this court under no. 94-13794 entitled *Susan Whitehill, Executrix of the Estate of Joann G. Palumbo, Deceased v. Herbert Mat-*

*thews M.D.* This complaint provides, in pertinent part, as follows:

"(2) Defendant, Herbert Matthews M.D., is a duly licensed physician who practices medicine in the Commonwealth of Pennsylvania hereinafter mentioned was the emergency room physician responsible for the treatment of plaintiff's decedent. . . .

"(4) On or about Saturday, March 6, 1993, plaintiff and her husband brought plaintiff's decedent to the emergency room at defendant, Riddle Memorial Hospital, where she was given treatment, where she was inter alia x-rayed and given a cardiogram. . . .

"(6) The aforementioned death of plaintiff's decedent, Joann G. Palumbo, was caused by the negligence and carelessness of the defendant, Dr. Herbert Matthews M.D., in that he failed to conform to an acceptable medical standard of care and ultimately increased the risk of harm suffered by plaintiff's decedent by:

"(a) Failing to call in for consultation a gastroenterologist in order to determine the ideology (sic) of plaintiff's decedent's acute abdomen.

"(b) Failing to timely diagnose and treat a perforated ulcer in spite of obvious clinical signs of a perforated ulcer such as pain, stomach distention and a decrease in blood pressure.

"(c) Failing to employ diagnostic modalities such as appropriate hemoglobin tests in order to ascertain that plaintiff's decedent was losing blood.

"(d) Failing to take into account plaintiff's decedent's history of long-term steroid use as well as clinical symptomatology.

"(e) Failing to timely diagnose and treat the perforated ulcer."

On February 17, 1995, the Honorable Joseph Battle of this court entered an order consolidating these lawsuits for trial. On October 30, 1996, this court entered an order scheduling trial during the court's four-week civil trial term beginning February 3, 1997. On February 7, 1997, a motion entitled defendant, Herbert Matthew M.D.'s, motion in limine to bifurcate the trial so as to try the issue of the applicability of the release as it pertains to Dr. Matthews separate and apart from the case in chief was filed. The cases were called for trial on February 10, 1997. At that time, all counsel agreed that the request to bifurcate should be granted. Counsel agreed that the court sitting without a jury should take evidence and testimony on the issue of the effect of the joint tort-feasor release on Dr. Matthews and should determine that issue before beginning the jury trial. A hearing was held on February 10, 1997. The only witnesses at that hearing were William F. Sutton and Dr. Matthews. Plaintiff's counsel did not testify at this hearing nor did plaintiff. On February 11, 1997, this court entered the following order:

"And now, to with, [sic] February 11, 1997, all parties having requested that this court take evidence and testimony and determine the validity and effect of the joint tort-feasor release executed by plaintiff on July 7, 1994, prior to the commencement of trial and a hearing having been held, this court finds that the joint tort-feasor release executed on July 7, 1994, is a valid and enforceable release which releases Riddle Memorial Hospital and its agents, ostensible agents, servants, heirs, executors, administrators, successors and assigns, including its ostensible agent, emergency room physician, Herbert Matthews M.D."

Thereafter, a jury trial was begun. The negligence of Dr. Matthews and Riddle was all but conceded. After

hearing several days of testimony, the jury returned with a verdict finding that Dr. Anderson was not negligent.[2] A timely post-trial motion was filed. The sole issue raised in that motion was the propriety of the order of this court dated February 11, 1997 which found that the joint tort-feasor release signed by plaintiff released not only Riddle but also their ostensible agent, Herbert Matthews M.D. After review of briefs submitted by counsel and oral argument, an order was entered denying plaintiff's post-trial motion. The instant appeal followed, thus necessitating this opinion.

Plaintiff's counsel makes the following four arguments in support of his position that the court erred in concluding that the joint tort-feasor release effectively released Dr. Matthews:

"(1) The release as it applies to Dr. Matthews was obtained by fraud and is therefore void.

"(2) The release as it applies to Dr. Matthews was obtained as a result of a unilateral mistake and is therefore voidable.

"(3) The court's interpretation of the release does not reflect the intent of the parties at the time of signing.

"(4) The court's interpretation of the release is unconscionable and is against public policy."

Addressing first the argument of plaintiff's counsel that the release is void as to Dr. Matthews because it was obtained by fraud, William Sutton, counsel for Riddle, had been retained by PHICO Insurance Com-

2. The verdict slip was designed so that if the jury found Dr. Anderson causally negligent, the jury would have then apportioned that negligence between Dr. Anderson, Dr. Matthews and Riddle. If the jury found that Dr. Anderson was not causally negligent, they were directed to answer no further questions and to return to the courtroom.

pany, the same insurance company that insured the emergency room physician, Dr. Matthews. Counsel argues that he was under the impression that Sutton represented Dr. Matthews as an employee of the hospital. Counsel argues that he requested to take the deposition of Dr. Matthews on three separate occasions but that Sutton never produced Dr. Matthews for deposition. Counsel contends that Sutton intentionally deceived him into believing that Dr. Matthews was an employee of Riddle when he was in fact an independent contractor and that Sutton was "stonewalling" the deposition of Dr. Matthews so that counsel would not discover his actual employment status. Counsel argues that Sutton was engaged in a conflict of interest and by his conduct was intentionally trying to secure an unfair advantage for his principal, PHICO Insurance Company, by allowing PHICO to reduce its exposure by incorporating into the settlement, plaintiff's claims against two separate insureds, Riddle and Herbert Matthews M.D.[3]

The simple answer to the argument of plaintiff's counsel is that Sutton did nothing improper during the course of his representation of Riddle Memorial Hospital and in his negotiations with plaintiff's counsel. There is nothing in this record to support the assertions of plaintiff's counsel that Sutton misrepresented the status of Dr. Matthews to him and actively concealed the fact that Dr. Matthews was an independent contractor. Plaintiff's counsel never asked Sutton what Matthews' status

---

3. The argument of plaintiff's counsel is interesting. He argues that he released Dr. Matthews from liability for his negligence in treating plaintiff's decedent as an agent/employee of the hospital but that he would not have released him for that same negligence if he was an ostensible agent/independent contractor. Under the facts of this case, the hospital was liable for the negligence of Dr. Matthews in either capacity and the same insurance company insured both.

was and, assuming that he knew, Sutton certainly had no obligation to volunteer this information.

If plaintiff's counsel did not know that Dr. Matthews was an independent contractor before plaintiff signed the release, he has no one to blame but himself. Under the Pennsylvania Rules of Civil Procedure, plaintiff's counsel could have scheduled the deposition of Dr. Matthews at any time prior to the execution of the joint tort-feasor release. If Dr. Matthews had failed or refused to appear for the deposition, counsel could have forced the issue and obtained a court order directing that Dr. Matthews appear.[4] The reality is that plaintiff's counsel could have determined the status of Dr. Matthews at Riddle whether Sutton wanted to cooperate or not. Although Sutton candidly admitted that he was not anxious to have plaintiff's counsel depose Dr. Matthews because he felt that Dr. Matthews' testimony would not be helpful to his client, we fail to see how his conduct rises to the level of fraud or concealment.[5]

In addition, after a settlement had been negotiated between plaintiff and Riddle but before the release was signed, Sutton called plaintiff's counsel to alert him to the fact that the release contained unusual language. This language had been inserted in the release because of an appellate decision, *Capan v. Divine Providence Hospital,* 287 Pa. Super. 364, 430 A.2d 647 (1980), which established the principle of ostensible agency in Pennsylvania in the context of a hospital emergency

---

4. In fact, counsel did exactly that in 1995 when he requested a court order directing Dr. Matthews' deposition, and Judge Battle entered an order dated March 31, 1995, directing that the deposition take place within 60 days.

5. Reformation of a release requires a showing of fraud by clear, precise and convincing evidence. *Wolbach v. Fry,* 488 Pa. 239, 412 A.2d 487 (1980).

room. Sutton told plaintiff's counsel that the language of the release was not the usual language and was designed to protect Riddle from any other lawsuits by plaintiff for care which plaintiff's decedent received at Riddle and specifically care received in the emergency room. Sutton told counsel that he was concerned about other lawsuits because the statute of limitations had not run and because of the fact that emergency room doctors could be found to be ostensible agents of the hospital. Plaintiff's counsel responded that he did not intend to file any other lawsuits.

After this telephone call and after he read the language of the release, if plaintiff's counsel did not realize that Dr. Matthews was being released from liability for the care and treatment of plaintiff's decedent, he should have. Dr. Matthews was clearly an ostensible agent. The language of the release is clear and ambiguous. Plaintiff was releasing Riddle and its ostensible agents from all claims of any nature that could have been included in the original lawsuit and was reserving the right to sue only Dr. Anderson for what happened to plaintiff at Riddle Hospital on March 6 and March 7, 1993. Under the circumstances, we don't know how Mr. Sutton could have made it any clearer.

Addressing next the argument of plaintiff's counsel that the release was the result of a unilateral mistake, counsel cites section 153 of the Restatement (Second) of Contracts in support of his position. Section 153 provides, in pertinent part, as follows:

"Where the mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performance that is adverse to him, the contract is voidable by him if he does not bear the risk of

the mistake under the rule stated in section 154, and
. . .

"(b) the other party had reason to know of the mistake
or his fault caused the mistake."

Section 154 provides, in pertinent part:

"A party bears the risk of a mistake when . . .

"(b) he is aware, at the time the contract was made,
that he has only limited knowledge with respect to
the facts to which the mistake relates but treats his
limited knowledge as sufficient . . . ."

In the instant case, it is clear that plaintiff's counsel
and plaintiff bear the risk of the mistake, if in fact
there was a mistake. William Sutton never discussed
with plaintiff's counsel the status of Dr. Matthews at
Riddle Memorial Hospital. Counsel never asked Sutton
about the status. Counsel had the ability to get this
knowledge by forcing the deposition of Dr. Matthews
before having his client sign the joint tort-feasor release.
In treating this limited knowledge as sufficient, plaintiff
and her counsel assumed the risk of a mistake.

Moreover, there is no reason to believe that Mr. Sutton
knew of the mistake or was at fault in causing the
mistake. Sutton testified that he did not intentionally
conceal Dr. Matthews' status from plaintiff's counsel
and that he had no knowledge as to what plaintiff's
counsel knew about the status of Dr. Matthews. In fact,
Sutton testified that he himself is not even sure that
he knew of Dr. Matthews' status as an independent
contractor when he was negotiating this settlement or
preparing this release but that as a practical matter it
didn't make any difference, the release would have
been the same. We have no reason to disbelieve that
testimony.

Addressing next the argument of plaintiff's counsel that the court's interpretation of the release does not reflect the intention of the parties at the time of the signing, we would again point out that neither plaintiff nor her counsel testified at the hearing. We therefore have no direct evidence as to what plaintiff or her attorney may have intended. However, we do have the plain and ambiguous language of the release, the fact that Dr. Matthews was clearly an ostensible agent and the intention of Sutton conveyed to plaintiff's counsel by telephone that the release was to cover emergency room doctors. This is more than sufficient to support the court's conclusion that the parties intended to release Dr. Matthews.

Finally, addressing the argument of plaintiff's counsel that the court's interpretation of the release is unconscionable and against public policy, this argument is based on counsel's assertion that Sutton fraudulently concealed Dr. Matthews' status at Riddle. These assertions have already been rejected. Counsel's argument is without foundation.

For these reasons, we denied plaintiff's post-trial motion.